IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN DOE, | ) | CASE NO. 22-CV-11540 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MASSACHUSETTS INSTITUTE OF | ) | |
| TECHNOLOGY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe,[1] ("**John**") by and through counsel, files his Complaint against Defendant Massachusetts Institute of Technology ("**MIT**") and respectfully alleges as follows:

## INTRODUCTION

1.      This Title IX, breach of contract, promissory estoppel, and basic fairness action is brought on behalf of John, who was wrongfully expelled from MIT on September 25, 2019.

2.      John seeks relief against Defendant MIT following MIT's discriminatory treatment and wrongful and unjustified expulsion following a Title IX proceeding based on false and unproven allegations brought by Jane Roe ("**Jane**"), John's former girlfriend and a fellow student of MIT.

3.      John was a victim of abuse and intimate partner violence at the hands of Jane, and he first reached out to MIT's Title IX office for help.

4.      MIT mishandled John's reports of abuse, and sided with Jane, John's abuser, because she is a woman, as more fully outlined herein.

---

[1] Concurrently with the filing of this Complaint, John Doe is filing a Motion to Proceed under Pseudonym.

1

5.     The unjust outcome was the direct result of MIT's, *inter alia*, (1) failure to conduct an adequate and unbiased investigation, (2) failure to provide John with the process as defined and promised in its own policies, (3) and its excessive and biased deference to Jane's rights and interests, to the total exclusion of the rights and interests of John.

## THE PARTIES

6.     John is a natural person who is a United States citizen currently residing in the Commonwealth of Puerto Rico, in the city of Mayagüez, studying and working in financial services.

7.     Until the MIT disciplinary proceeding that was brought against John by Jane, John had an unblemished disciplinary record at MIT.

8.     MIT is an educational institution located in the city of Cambridge, in the Commonwealth of Massachusetts, with a main address of 77 Massachusetts Avenue, Cambridge, Massachusetts, 02139.

9.     MIT was incorporated in 1861. The self-stated mission of MIT is to advance knowledge and educate students in science, technology and other areas of scholarship, and MIT represents publicly that it seeks to develop in each member of the MIT community the ability and passion to work wisely, creatively and effectively for the betterment of mankind. The motto of MIT is "*mens et manus*" ("mind and hand").

10.     As of October 30, 2019, MIT had 4,530 undergraduate students, approximately half of whom were women and half of whom were minority students.

11.     MIT has received and receives federal funding.

2

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship: the Plaintiff John Doe is a citizen of the Commonwealth of Puerto Rico, and the Defendant MIT is a citizen of the state of Massachusetts.

13.     The matter in controversy in this action exceeds the sum of $75,000.

14.     This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United States—Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

15.     This Court has personal jurisdiction over MIT on the grounds that MIT is conducting business in the State of Massachusetts and is a resident of the state of Massachusetts and that MIT's actions that are the subject of this action took place within the District of Massachusetts.

16.     This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

4885-3344-5675, v. 14

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

I.    **Factual Background**

A.  **John and Jane Meet and Begin a Relationship**

18.    John dated fellow MIT student Jane from approximately October 2017 to January 2019, off and on.

19.    John and Jane lived in the same dormitory hall at MIT and shared a mutual group of friends.

20.    John and Jane eventually began a sexual relationship and began officially dating in October of 2017.

21.    Around August of 2017, John observed that Jane would have frequent episodes of shaking and crying during which Jane would grip, squeeze, and scratch John.

22.    John and Jane had a tumultuous relationship, caused in part by Jane's physical abuse of John, which she attributed to her suffering from borderline personality disorder and post-traumatic stress disorder.

23.    During the early period of their relationship, Jane's physical abuse of John was infrequent.

24.    During one of the first instances of Jane's physical abuse of John, Jane punched John while the two took a train together.

B.  **Jane's Abuse Worsens November to December 2017**

25.    As a part of Jane's mental health issues, Jane would occasionally suffer from what she called "episodes," or "coffin nights," and during which she would cry, and slap and hit John.

4

26.     Jane's "episodes" worsened from November to December of 2017.

27.     Jane engaged in and informed John about various self-harming behaviors, including cutting her skin and burning herself with a candle.

28.     Jane became manipulative and sexually coercive of John, expressing emotions to pressure John into unwanted sexual contact with her.

29.     Occasionally, when John would attempt to stop sexual contact in progress, Jane would cry or ignore him, continually touching John's genitals without his consent.

30.     In addition to sexual abuse, Jane was also physically abusive towards John, including physically slapping and hitting him.

**C. Jane's Suicide Attempt in Spring of 2018**

31.     In Spring of 2018, Jane continued to self-harm and tell John about her behaviors, causing John to worry about Jane.

32.     Jane frequently asked John to "hide" knives and weapons from her so that she would not hurt herself.

33.     On one occasion, John came into Jane's unlocked room after she had texted him that she wanted company, and Jane held a razorblade-style knife to her wrist.

34.     After this incident, John reported Jane's mental health issues to MIT personnel to get her help.

35.     Jane became furious with John for reporting her suicide attempt and mental health struggles.

**D.     Jane's Sexual and Emotional Abuse Intensifies Summer to Fall 2018**

36.     Jane's sexual abuse of John intensified in Summer through Fall of 2018.

5

37.     Jane began to shame John in front of their shared friends for his "lack of sex drive."

38.     Jane cornered John in the shower and anally raped him with objects, including a shampoo bottle.

39.     Jane digitally penetrated John's anus without his consent.

40.     Jane raped John at least twenty (20) times.

41.     Jane took advantage of John sexually while he was intoxicated.

42.     While John was seated in a chair, Jane bit John's genitals while performing oral sex on him.

43.     John and Jane began fighting more intensely and frequently at this time, with each fight involving profanity and name-calling.

44.     John attempted to confront Jane about her physical and sexual abuse during a trip to Walden Pond State Reservation in Fall 2018.

45.     Upon hearing John's description of her abuse, Jane had what appeared to be a panic attack and refused to listen to John's description of her abusive behaviors.

46.     John accessed resources from MIT's Violence Prevention and Response ("**VPR**") office on October 18, 2018, in connection with his relationship with Jane.

47.     John was given resources by a VPR advocate on how to navigate a relationship with an individual with borderline personality disorder and when to walk away.

48.     John felt ill-equipped to handle Jane's worsening mental health issues and broke up with Jane on or around September 15, 2018.

49.     John and Jane eventually resumed "hooking up" and fell back into a relationship in Winter of 2018.

6

50. John felt a responsibility to take care of Jane due to her worsening mental health issues.

51. Despite the intensity and increasing frequency of Jane's abuse, John was reluctant to formally report Jane's abuse due to fears that Jane would be institutionalized and that her career prospects would be jeopardized.

52. By early 2019, John and Jane's relationship had even further deteriorated, and Jane became even more unstable.

53. John felt the need to hide from and avoid Jane, sometimes sleeping in hallways to prevent her from finding him.

54. John canceled dates with Jane to avoid her abuse.

55. In early 2019, John and Jane broke up for the last time.

56. John and Jane had two sexual encounters following their breakup.

57. The day after John and Jane's last sexual encounter, Jane, in an effort to provoke John, told John that she had slept with someone else on the night of January 27, 2019.

58. John, upset at learning this information, shouted at Jane, splashed lukewarm water from a half-empty one-liter water bottle on Jane, yelled at her, and tore a map decoration hanging on her dorm room wall.

59. John immediately and consistently took responsibility for his actions the night of January 27, 2019, in response to Jane's provocation.

60. Jane never acknowledged her abuse of John.

## II.    External Pressures on MIT Create Anti-Male Bias in the Enforcement of Title IX

61.    Title IX of the Education Amendments Act of 1972 provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

62.    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. MIT is a recipient of federal funds and is thereby bound by Title IX and its regulations.

63.    On April 4, 2011, the United States Department of Education's ("USDOE") Office of Civil Rights ("OCR") issued its now infamous "Dear Colleague Letter," which instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX.. Dear Colleague Letter, U.S. Dept. of Educ. at 4 (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

64.    Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. *See* 5 U.S.C. § 553.

65.    The 2011 Dear Colleague Letter defined discrimination on the basis of sex to include sexual harassment of students, which was defined to include acts of sexual violence. Dear Colleague Letter, U.S. Dept. of Educ. at 1 (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf

8

66.     The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

67.     OCR has warned schools to provide basic procedural protections to students, instructing that grievance procedures must provide "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence," and "equitable grievance procedures." *See* Dear Colleague Letter; *see also* Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. On Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.) ("[S]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."). OCR warned schools that "[t]his Administration is committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." *Id.*

68.     Further, in 2017, in interim guidance issued after rescinding the 2011 Dear Colleague Letter, OCR "cautioned" schools "to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication." U.S. Dept. of Ed. Office for Civil Rights, Q&A on Campus Sexual Misconduct (Sept. 2017).

9

69.     Even though the USDOE formally rescinded the 2011 Dear Colleague Letter on September 22, 2017, schools largely continued to enforce the policies and procedures instituted in response to it.

**III.     Internal Pressures at MIT Create Anti-Male Bias in the Enforcement of Title IX**

70.     MIT has responded aggressively to accusations of supporting males accused of sexual crimes.

71.     MIT has recently been in the public spotlight in connection with a scandal surrounding donations by Jeffrey Epstein. *See* Steve Bradt, *MIT releases results of fact-finding on engagements with Jeffrey Epstein*, January 10, 2020 (chronicling "10 Epstein donations, totaling $850,000, that MIT received between 2002 and 2017, as well as multiple visits that Epstein made to campus"), https://news.mit.edu/2020/mit-releases-results-fact-finding-report-jeffrey-epstein-0110.

72.     MIT presently has two open investigations by the Department of Education Office for Civil Rights ("OCR"), and both open investigations involve allegations of institutionalized bias against male students and prospective students, all on the basis of sex. *See* Exhibit 1, Open OCR Investigation Documents.

73.     A review of MIT's Clery Act statistics reveals that in 2018, there were fourteen (14) reported rapes, nine (9) reported fondlings, eight (8) complaints of domestic violence, three (3) complaints of dating violence on MIT's campus.

74.     According to MIT's Clery Act statistics, in 2019, there were twelve (12) reported rapes, (4) reported fondlings, fifteen (15) reports of domestic violence, and two (2) reports of dating violence on MIT's campus.

75.     Upon information and belief, the disproportionate majority of students disciplined by MIT in connection with the reported offenses outlined in paragraphs 13-14, *supra*, were male students, regardless of the gender of the reporting parties.

76.     In its Committee on Sexual Misconduct Prevention and Response ("CSMPR") Annual Report from 2019, MIT admitted that "MIT faculty and staff overwhelmingly have received substantially less training [in sexual misconduct topics including sexual assault, dating violence, domestic violence, stalking, and sexual harassment] compared to faculty and staff nationally." *See* MIT CSMPR Annual Report 2019, Exhibit 1, p. 9.

77.     At the time of the events at issue in this Complaint, MIT had adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct in an attempt to comply with Title IX requirements.

78.     Despite its attempts to comply with Title IX requirements, MIT's enactment and application of its policies and procedures served to perpetuate violations of Title IX by permitting gender discrimination against males on the basis of sex.

IV.     **MIT Policies Promise Fairness and Impartiality in Title IX Adjudication**

        A.  **The Guide**

79.     The Guide to MIT's Investigation and Resolution Process for Student Cases of Gender-Based Discrimination, Sexual Misconduct, Intimate Partner Violence, Stalking, and/or Gender-based Bullying or Hazing (the "***Guide***," attached hereto as Exhibit 2) governed MIT's investigation of John's and Jane's allegations.

80.     The Guide states that the "Institute encourages anyone who experiences or becomes aware of an incident of gender-based discrimination to immediately report the incident to the

11

Institute by notifying the Institute Title IX Coordinator or any Deputy Title IX Coordinator." *Id.* p. 3.

81.     The Guide represents that an investigation must be a "neutral fact-gathering process" and "the purpose of the investigation is for a trained and unbiased investigator to assemble and present all relevant information." *Id.* pp. 9, 12.

82.     The Guide specifies that the "[i]nvestigator has the discretion to determine the relevance of any witness or any proffered evidence." *Id.* p. 12.

83.     The Guide states, "[i]n general, the [i]nvestigator will not consider information that is irrelevant, immaterial, or more prejudicial than informative." *Id.*

84.     The Guide provides that, "[i]n general, the [i]nvestigator will not consider statements of personal opinion about another's character." *Id.*

85.     The Guide requires that the "sexual history of a Complainant or Respondent will never be used to prove character or reputation. Moreover, evidence related to the prior sexual history of either party is generally not relevant to the determination of a policy violation and will be considered only in limited circumstances. The Investigator will determine the relevance of this information." *Id.*

86.     The investigator is to conduct a "full, thorough, prompt, fair, and impartial investigation." *Id.* p. 8.

87.     At the conclusion of the investigation, an investigator makes a recommendation as to whether a respondent should be found responsible, and for what charges. *Id.* p. 13.

88.     If both parties accept their findings, the fact-finding process comes to a close and the case enters a sanctioning phase. *Id.* p. 14.

12

89.     If either party disagrees with the findings, then MIT holds a Committee on Discipline ("*COD*") hearing. *Id*. pp. 2, 9, 15.

90.     Members of the COD are provided with the investigative report and exhibits that the investigators compile. *Id*. p. 13.

91.     The Guide states that parties have the right, during the investigation, to identify witnesses and to propose questions for them. *Id*. p. 11.

92.     The Guide provides that both parties have the right "to be heard by providing written statements, providing oral statements, and responding to questions from the Investigator(s)." *Id*. p. 11.

93.     The Guide further states that "[c]omplainants are entitled to receive information, assistance, and a broad range of support and remedial measures regardless of whether they choose to pursue criminal and/or Institute disciplinary resolution." *Id*. p. 4.

94.     The Guide specifies that the Title IX Coordinator, in cases involving health and safety concerns, shall:

A.  Assess the complainant's safety and well-being and offer the Institute's immediate support and assistance;

B.  In cases involving recent physical or sexual assault, inform the complainant of the right to seek medical treatment, and explain the importance of obtaining and preserving forensic and other evidence;

C.  In cases involving allegations of criminal conduct, inform the complainant of the right to contact law enforcement, decline to contact law enforcement, and/or seek a court ordered protective order;

13

D.  Assess the information provided regarding the gender-based discrimination, including whether it provides the names and/or any other information that personally identifies the complainant, the respondent, any witness, and/or any third party with knowledge of the reported incident;

E.  Inform the complainant of formal and informal resolution options; determine the complainant's expressed preference at this time for pursuing informal resolution, formal resolution, or neither; and discuss with the complainant any concerns or barriers to participating in any Institute investigation and resolution under this process; [and]

F.  Explain the Institute's prohibition against retaliation and that the Institute will take prompt action in response to any act of retaliation. *Id.*

95.  The Guide provides that the "Title IX Coordinator (or designee) may take interim measures...[which are] available regardless of whether a [c]omplainant files a formal complaint." *Id*. p. 5.

96.  MIT's Guide provides that "[i]n general, documents that have not been submitted during the investigation and included in the investigation report may not be presented to the COD prior to or at the COD hearing." *Id*. p. 9.

97.  MIT's Guide permits "[t]he COD Chair [to] permit documents to be submitted that were not part of the investigation upon a showing of good cause. The COD may, however, consider the fact that the documents were not provided during the investigation when determining the credibility of the information/evidence offered and the weight to give that evidence." *Id.*

14

98.     MIT's Guide promises all parties "an equal opportunity to participate, including the opportunity; (1) to be heard by providing written statements, providing oral statements, and responding to questions from the Investigator(s); (2) to submit information and corroborating evidence; (3) to identify witnesses who may have relevant information about the reported conduct; (4) to submit questions that they believe should be directed by the Investigator to each other or to any witness; and (5) to respond to the facts and statements gathered during the investigation." *Id.* p. 11.

99.     MIT's policy permits the Investigator to coordinate with law enforcement to ascertain the "extent to which any evidence collected by law enforcement may be available to the Institute in its investigation." *Id.* p. 12.

### B. The Mind and Hand Books

100.     MIT's Mind and Hand Books for the 2017-2018, 2018-2019, and 2019-2020 academic years each outline prohibited behavior for students of MIT as well as potential consequences for violation of the policies contained within each. *See* 2019-2020 Mind and Hand Book, attached as Exhibit 3.

## V.     MIT's Title IX Office Begins Involvement

### A. The Timing of Jane's Complaint Demonstrates Jane's Retaliatory Motive.

101.     On or around February 6, 2019, Jane met with MIT's Title IX office and requested a mutual no-contact order between herself and John.

102.     Jane declined to file a Title IX complaint during the February 6th meeting.

103.     On or around February 13, 2019, John met with MIT's Title IX Coordinator, Sarah Rankin, and learned of Jane's request for a mutual no-contact order.

15

104.   At this February 13th meeting, John reported Jane's abuse to Ms. Rankin, including Jane's prior physical abuse.

105.   Jane had made no formal report of any of John's alleged behaviors before the February 13th meeting.

106.   At the February 13th meeting, Ms. Rankin asked John, "why are you bringing this up now?" in response to John's disclosure that Jane had abused him.

107.   Ms. Rankin told John not to report his allegations of Jane's abuse to the district attorney, that the district attorney "would ignore" John's claims, and that John "has no evidence."

108.   Ms. Rankin did not offer John the opportunity to submit a formal Title IX complaint at the time of the February 13th meeting.

109.   Ms. Rankin did not encourage John to submit a formal Title IX complaint at the time of the February 13th meeting.

110.   Ms. Rankin did not submit a Title IX complaint on John's behalf after learning that Jane had abused John.

### B. John and Jane are Immediately Treated Differently by MIT's Title IX Personnel Because John is a Male and Jane is a Female.

111.   Ms. Rankin imposed a "mutual" no-contact order between John and Jane.

112.   Despite a mutual no-contact order issued to both John and Jane, Ms. Rankin instructed John alone that he was not to return to John and Jane's shared dormitory hall.

113.   Jane, by contrast, was permitted to remain in the dormitory despite John's report to Ms. Rankin that Jane had physically abused him.

114.   Ms. Rankin's different treatment of John and Jane with regard to the "mutual" no-contact order was because John is a male and Jane is a female.

16

115.     Shortly after MIT made the decision to restrict John from his dorm while permitting Jane to remain in place, John was voluntarily hospitalized for mental health care.

### C. Jane Retaliates against John for Reporting Her Abuse, and MIT Fails to Protect John or Discipline Jane

116.     While Jane was permitted to remain in the dormitory hall, she widely shared her version of events with others, isolating John from his friends and fellow students in an act of retaliation for reporting Jane's abuse.

117.     On or about February 15, 2019, Ms. Rankin met with Jane and informed Jane of John's report of abuse.

118.     On or about February 17, 2019, and after learning of John's February 13th report, Jane decided to submit a formal Title IX complaint against John.

119.     Upon information and belief, Ms. Rankin encouraged Jane to file a formal Title IX complaint against John despite knowledge of John's prior allegations of abuse by Jane.

120.     Ms. Rankin encouraged Jane to file a Title IX complaint because she is a female.

121.     Upon information and belief, Jane's submission of a Title IX complaint against John was made in retaliation for John's informal report of Jane's abuse.

122.     Jane's retaliatory motivation is evidenced, in part, by the timing of her complaint compared to John's prior report of Jane's abuse.

123.     Jane's retaliatory motivation is further evidenced by blatant inconsistencies, changes, and embellishments in Jane's allegations as MIT's Title IX investigations proceeded, including, but not limited to: (i) Jane's addition of allegations of sexual abuse not included in her initial complaint; (ii) Jane's re-characterization of incidents she originally described as accidents as physical assaults; and (iii) Jane's belated submission of materials, drafted by her attorneys, that

17

both changed the nature of her original allegations and added additional instances in which she alleged sexual misconduct by John, as more fully outlined herein.

124.  MIT failed to examine or investigate the inconsistencies in Jane's reports due to gender bias against John.

125.  Jane's February 17, 2019, Title IX complaint included only three allegations:

  A.  Jane reported that John came into her dormitory, splashed water on her, and broke a decoration on her wall on January 27, 2019;

  B.  Jane reported that, on one occasion, John "jokingly" pushed Jane into a wall; and

  C.  Jane reported that, on one occasion, John was "coercive" to her, and refused to leave her room when she asked him to.

126.  Jane made no allegations of sexual misconduct of any kind by John in her February 17th Title IX complaint.

127.  On or about March 2, 2019, and with no knowledge of Jane's formal Title IX complaint, John informed Ms. Rankin that he was considering submitting a formal Title IX complaint against Jane.

128.  Ms. Rankin did not encourage John to file a Title IX complaint on or about March 2, 2019.

129.  Ms. Rankin did not submit a Title IX complaint on John's behalf on or about March 2, 2019.

130.  Ms. Rankin did not file a Title IX complaint nor encourage John to file a Title IX complaint because John is a male.

18

131.    On or about March 4, 2019, Jane filed an additional Title IX complaint against John, this time adding an allegation that John engaged in non-consensual sex with her on one occasion on or around September 23, 2018.

132.    Text messages between John and Jane around September 23-24, 2018, reveal that Jane was messaging John in a happy and joking way about their sexual encounter on or around September 23, 2018.

133.    Upon information and belief, in contrast with MIT Title IX personnel's treatment of John, Jane was not questioned why she did not report this alleged abuse at an earlier time or why she continued to spend time with John and engage with him positively over text messages.

134.    MIT's preferential treatment of Jane's complaints compared with its callousness and dismissal of John's complaints demonstrated anti-male gender bias.

135.    On or about March 9, 2019, John again informed Title IX personnel that he intended to file a formal Title IX complaint against Jane.

136.    John only received detailed information about Jane's Title IX complaint on or about March 11, 2019, one day before his first interview.

137.    At his first interview with Title IX personnel, John was immediately asked to make a decision as to whether he was responsible for each of the alleged violations of MIT policy, without permitting John any opportunity to explain or contextualize his responses.

138.    On or about March 12-13, 2019, John corresponded with Jamie Sinetar and Justin Brogden in MIT's Title IX office and confirmed that he intended to report the following:

> A.  Jane physically abused John on multiple occasions;
>
> B.  Jane touched John's genitals without his consent;

19

C.  Jane pressured John to engage in sex with her; and when John would decline sex, Jane would:

        (i)     Storm out and slam the door;

        (ii)    Scream at John;

        (iii)   Throw tantrums;

        (iv)   Shame John about his lack of sex drive in front of his friends; or

        (v)    Have a panic attack.

D.  Jane engaged in non-consensual sexual contact with John; and

E.  Jane had engaged in non-consensual anal penetration (rape) of John approximately twenty (20) times.

139.  Ms. Sinetar did not offer John the opportunity to submit a Title IX complaint.

140.  Ms. Sinetar did not encourage John to submit a Title IX complaint.

141.  Ms. Sinetar did not file a Title IX complaint on John's behalf and initiated no investigation of Jane.

142.  Mr. Brogden did not offer John the opportunity to submit a Title IX complaint.

143.  Mr. Brogden did not encourage John to submit a Title IX complaint.

144.  Mr. Brogden did not file a Title IX complaint on John's behalf and initiated no investigation of Jane.

145.  Ms. Sinetar and Mr. Brogden treated John less favorably than Jane because John is a male.

146.     On or about March 17, 2019, John met with MIT's Division of Student Life to discuss the situation with Jane, and John appealed the determination that prevented him from returning to his dormitory, while Jane was permitted to remain in her living situation, undisturbed.

147.     John's appeal of his removal from the dorm pursuant to the "mutual" no-contact order was later denied.

148.     In late March or early April 2019, John spoke with the Boston Area Rape Crisis Center and was encouraged to file a formal complaint against Jane.

149.     On or about April 3, 2019, John submitted a formal Title IX complaint against Jane.

150.     In a meeting with Title IX personnel, Mr. Brogden explicitly told John that he had "no evidence" of his claims, despite MIT conducting no investigation whatsoever.

151.     Due to John's negative experience with MIT's Title IX personnel, John withdrew his initial Title IX complaint on or about April 12, 2019, fearing that MIT would not fairly investigate or adjudicate his complaint.

152.     Around this time and after withdrawing his complaint, John contacted the MIT police, hoping that the police would fairly investigate his allegations, which included serious allegations of both physical and sexual abuse by Jane.

153.     On or about May 8, 2019, Jane was interviewed again by MIT's Title IX office, and she added a second allegation of non-consensual sexual contact by John.

154.     On or about May 27, 2019, John again filed a formal Title IX complaint outlining his prior and consistent reports to MIT's Title IX personnel, detailing Jane's sexual and physical abuse.

21

155.    On or about June 18, 2019, MIT's Title IX office informed John and Jane that they would be conducting a single, joint investigation into both John's and Jane's claims.

## VI.    **MIT Conducts a Title IX Investigation**

156.    In John's and Jane's combined case, Jamie Sinetar and Justin Brogden were the investigators.

157.    Jane was investigated for violation of the following 2017-19 Mind and Hand Book Section II provisions:

(a)    Assault and Reckless Endangerment

(b)    Community Well-Being

(c)    Institute Expectations of Student Behavior and Integrity

(d)    Intimate Partner Violence

(e)    Retaliation

(f)    Sexual Misconduct; and

(g)    Unauthorized Access.

158.    Jane did not accept responsibility for any violation.

159.    John was investigated for violation of the following provisions of the 2017-19 Mind and Hand Book Section II:

(a)    Assault and Reckless Endangerment;

(b)    Harassment;

(c)    Institute Expectations of Student Behavior and Integrity;

(d)    Intimate Partner Violence;

(e)    Property Damage and Destruction;

> (f)  Retaliation;
>
> (g)  Sexual Misconduct;
>
> (h)  Sexual Misconduct;
>
> (i)  Stalking; and
>
> (j)  Unauthorized Access.

160.    John accepted responsibility for certain violations, and denied responsibility for (i) retaliation; (ii) sexual misconduct; and (iii) unauthorized access.

161.    During the investigation, John identified forty (40) individuals who had knowledge of his claims, either because they had witnessed his interactions with Jane while the parties were dating or because he had spoken to those witnesses about the abuse that was occurring in the relationship.

162.    Investigators only spoke with twenty (20) of John's proposed witnesses, without consultation with John as to which witnesses had the most relevant information.

163.    When investigators informed John which of his identified witnesses they intended to interview, John did not request that they identify each witness he had identified; instead, John requested that the investigators interview a specified few of the witnesses with the most relevant evidence.

164.    The investigators did not interview the witnesses John identified as particularly relevant to his Title IX case.

165.    Upon information and belief, the investigators interviewed each witness identified by Jane in connection with the investigation.

23

166.    Of the witnesses ("***Witness A***") John identified as particularly relevant to MIT's investigation, one was a friend of John's who could have testified that John spoke to him on two occasions in 2017 and 2018 about the abuse by Jane.

167.    John told Witness A about Jane's sexual abuse and about her suicide attempt.

168.    Investigators represented that they had reached out to Witness A, but Witness A did not hear from investigators.

169.    John attempted to use an affidavit from Witness A as evidence during the COD hearing, but was not permitted to do so.

170.    John asked investigators to ask two other witnesses about an incidence of Jane's abuse that took place on or about January 25, 2019, in which Jane threw water at John, spit on him, and stepped on him. The investigators did not ask witnesses about the incident.

171.    Investigators failed to obtain any information collected during the MIT police investigation opened into John's report of abuse by Jane.

172.    John requested that Title IX investigators obtain the VPR transcripts as well as records connected to his prior reports of Jane's abuse to his student deans.

173.    Investigators failed to obtain information from VPR regarding John's contemporaneous report of Jane's abuse in 2018.

174.    Investigators failed to gather records from John's student deans related to his disclosures of Jane's abuse.

175.    Investigators also failed to investigate Jane's social retaliation against John, including attempts to smear his reputation to their mutual friends in violation of MIT policies.

176. Investigators improperly considered John's sexual history to extrapolate his sexual "tendencies," in violation of the Guide, based on an interview with an ex-girlfriend otherwise uninvolved with the investigation.

177. Investigators interviewed John's ex-girlfriend and extensively cited her irrelevant testimony that John would occasionally ask for sex multiple times.

178. Throughout the investigation, John's submissions to investigators contained details of his relationship and allegations of the abuse he endured, but these documents were often rough or incomplete due to John's mental health at this time.

179. John was told by Title IX investigators from May-June 2019 that he was not permitted to ask questions of witnesses or Jane because the investigation was "over."

180. During that same time period, Jane was permitted to question John and witnesses in connection with the investigation.

181. John was prohibited from gathering evidence while Jane was permitted to do so due to anti-male gender bias.

182. John was asked to provide personal messages between himself and his friends in connection with the investigation.

183. Jane was never asked to provide personal messages between herself and her friends or colleagues in connection with the investigation.

184. John specifically requested that investigators ask Jane for specific group messages due to the likelihood that these messages would contain relevant information.

185. The investigators asked for John's messages and not Jane's due to their anti-male bias, and at the expense of investigating John's claims against Jane.

25

186.     The investigators' inequitable allocation of resources to the investigation of John's and Jane's claims demonstrates gender bias against John.

187.     On or about July 10, 2019, Jane added to and significantly changed her claims of sexual misconduct against John in a letter drafted by her attorney.

188.     On or about August 20, 2019, John informed Title IX investigators that he intended to submit a comprehensive document detailing his abuse by Jane.

189.     John had previously informed investigators that this draft document existed as early as June of 2019.

190.     On or about August 21, 2019, investigators told John for the first time that he would not be permitted to submit any further documents and that they would not investigate the allegations contained within any such documents.

191.     Jamie Sinetar told John that it was "unreasonable" to add allegations at this point of the investigation.

192.     John had no choice but to compile a document outlining Jane's abuse because investigators failed to investigate any of Jane's misconduct against John, instead solely focusing on Jane's allegations against John.

193.     By contrast, investigators accepted and investigated new and different allegations of misconduct contained in a document drafted by Jane's counsel as late as August 29, 2019, after John was told he could not submit additional documents.

194.     The letter drafted by Jane's counsel was shared with the hearing panel.

195.     John was not permitted to submit his comprehensive document outlining Jane's abuse on August 21 due to anti-male gender bias.

4885-3344-5675, v. 14

196.    On or about September 10, 2019, the investigators issued their investigative report, in which they recommended that John be found responsible for all but one of Jane's allegations against him.

197.    The investigators also wrote in their report that Jane should be found not responsible for all charges against her.

## VII.    The Investigators Assessed John and Jane's Demeanors and Evidence Differently, Demonstrating Gender Bias

198.    Investigators purportedly weighed credibility, demeanor, corroboration, plausibility, and motive to falsify for each participant in the Title IX process to determine responsibility.

199.    Investigators consistently assessed John and Jane very differently in each category, drawing conclusions in Jane's favor where evidence was neutral or favorable to John's credibility, further demonstrating gender bias.

### A.  Differential "Blanket" Assessment of Credibility due to Gender Bias

200.    The bases of the investigators' findings were largely contradictory findings of credibility that showed bias in favor of Jane and against John based on similar evidence.

201.    The report notes that investigators' practice is not to make a "blanket" credibility determination, but to consider evidence as to each alleged incident.

202.    The report did the opposite, considering facts regarding multiple incidents together to make a blanket credibility determination that John should be uniformly disbelieved and found responsible for all charges, and Jane should be found credible and thus not responsible for the majority of charges.

27

203.     Investigators concluded that John's claims of disinterest in sex with Jane were not credible based on isolated texts in which John engaged in sexual banter with Jane.

204.     Investigators made no mention of Jane's engagement in sexual banter with John despite her claims that John had engaged in various assaults against Jane.

205.     Investigators' differential assessment of blanket credibility as to John and Jane is based on gender bias.

### B.  Differential Assessment of Demeanor due to Gender Bias

206.     Investigators wrote that Jane was a "cooperative participant" in the investigation.

207.     Investigators did not acknowledge or comment upon John's cooperation and participation in the investigative process.

208.     Investigators claimed that John's "account of different events evolved over the course of the investigation and was often inconsistent."

209.     Investigators' alleged inconsistencies in John's accounts of events were insignificant or nonexistent.

210.     Investigators claimed John was inconsistent in describing an event where his interview summary clearly demonstrated that he referred to two separate, but related, events when describing Jane shoving him while on a hiking trip.

211.     In other instances, John provided additional details to investigators in later interviews.

212.     Unlike Jane, John was always consistent in his factual recitation.

213.     Investigators, by contrast, did not note the numerous inconsistencies in Jane's account of key events.

28

214.     Jane changed her story to claim that incidents she originally described as accidents were in fact deliberate assaults by John, and she added and changed her allegations as the investigation continued.

215.     For example, Jane's original Title IX complaint contained no allegations of sexual misconduct, but Jane later added several separate and increasingly detailed false allegations of sexual misconduct by John.

216.     Investigators failed to acknowledge that the clearest construction of Jane's claims were drafted and submitted by her lawyers and not by Jane directly.

### C.  Differential Assessment of Corroboration due to Gender Bias

217.     Investigators claimed that there was corroboration for Jane's claims, pointing to largely undisputed allegations regarding the night of January 27, 2019.

218.     Investigators ignored a total lack of corroboration for Jane's sexual misconduct claims that John did dispute, such as the complete lack of witnesses who even spoke to Jane about these events when they were allegedly occurring.

219.     The investigators also ignored that John and Jane's text messages demonstrated that the two remained on good terms at the very time Jane claimed various assaults were occurring.

220.     In contrast to the assessment of Jane's credibility, investigators stated that there was no corroborating evidence for John's claims, despite much corroboration contained in the record, including statements to John's friends contemporaneously with the events in question.

221.     Specifically, one witness recalled that John disclosed, long before the Title IX process was initiated, that Jane would sometimes force John to engage in sexual activity.

29

222.    Witnesses also described changes in John's demeanor while Jane was present, explaining that John would become tense, quiet, and intensely focused on Jane, and further recounted that John's whole day would revolve around whether Jane was upset with him, that Jane would become upset very easily, and that John was very focused on getting Jane to a happier place.

223.    One witness corroborated seeing Jane hit John in public at a bar, and that John later told the witness that Jane was anxious and mad at him.

224.    Another witness stated that during the relationship, John told the witness that he was feeling pressured to have sex with Jane and was having sex that he did not want to.

225.    Another witness corroborated that John communicated at the time that Jane took advantage of him sexually.

226.    This evidence corroborating John's account of events was often included in witness summaries, but conspicuously left out of the final report.

227.    John submitted a photograph as evidence that Jane was not on crutches, as she falsely claimed to investigators, during an incident in which Jane slapped John.

228.    None of the corroborating information related to John's accounts was discussed in the portion of the investigative report concerning credibility.

### D.  Differential Assessment of Plausibility due to Gender Bias

229.    Outside of a discussion of credibility, when evaluating Jane's specific claims of sexual assault, the investigators noted that her claims were indeed inconsistent. However, the investigators stated that Jane had offered "plausible" explanations for not being forthcoming sooner.

4885-3344-5675, v. 14

230.    Referring to Jane, investigators wrote that it is "not uncommon for students to be embarrassed about sharing these types of details related to their sexual activity," and noted that when describing long-term relationships, people can become confused about details.

231.    John was afforded none of these explanations for potential inconsistency, despite the fact that each explanation applied equally well to any perceived inconsistency in John's account of events.

232.    The investigators failed to acknowledge that male students are often particularly reluctant to recount sexual violence committed against them. *See, e.g.,* Patrizia Riccardi, MD, Male Rape: The Silent Victim and the Gender of the Listener, Prim. Care Companion J. Clin. Psychiatry, 2010 12(6), citing Martin L, Rosen LN, Durand DB, et al. Mil Med. 1998;163(4):213–216.

233.    The investigators demonstrated incredulity that Jane could physically restrain John, writing that John "offered no explanation as to why [Jane] holding his knees prevented him from moving[,]" demonstrating gender bias.

234.    The investigators further stated that it was "implausible" that John feared Jane, demonstrating reliance on sexist masculine and feminine stereotypes of sex and power dynamics in their analysis of the evidence.

235.    Jane is larger than John, at 5'11" and 180 lbs.

236.    John is 5'7" and weighs 150 lbs.

237.    The investigators participated in victim-blaming of John, stating that John had "offered no clear explanation as to why he continued to sleep with [Jane] after she engaged in repeated sexual misconduct."

4885-3344-5675, v. 14

238.    Investigators made no such victim-blaming comments with regard to Jane's account of alleged sexual abuse by John, instead taking Jane's accounts at face value.

239.    Investigators assessed John's demeanor and tone in Facebook messages as inconsistent with his allegations of abuse.

240.    Investigators did not comment on Jane's demeanor in friendly and sexually explicit text messages she sent to John purportedly hours or days after alleged sexual assaults.

241.    Investigators drew opposite conclusions from substantially similar evidence, demonstrating anti-male gender bias against John and in favor of Jane.

**E.  Differential Assessment of Motive to Falsify due to Gender Bias**

242.    The investigative report claims that John was motivated to falsify a report because he did not submit a formal complaint to Title IX until after Jane requested a no-contact order.

243.    The investigative report suggests in a conclusory fashion that Jane had no motive to falsify her complaint.

244.    Jane had a motive to falsify her Title IX complaint to avoid a finding of responsibility for her physical and sexual abuse of John.

245.    Investigators ignored the actual timeline of events in which John's report of sexual and physical abuse by Jane pre-dated Jane's complaint of any specific alleged misconduct by John.

**VIII.    MIT Conducts a Title IX Hearing**

246.    On or about September 13, 2019, a COD hearing panel convened to evaluate John's and Jane's claims.

247.    During the hearing, Jane's attorney interrupted Jane and guided her testimony.

32

248.     The hearing panel issued a written decision on September 17, 2019, relying heavily on the report and recommendation prepared by the investigators.

249.     The hearing panel improperly and inappropriately relied on testimony by a witness completely uninvolved in any allegations outlined in the complaints, John's ex-girlfriend, in order to make a blanket determination that John had a "tendency" to commit the violations alleged (and despite no allegation that John had sexually assaulted or harassed his ex-girlfriend).

250.     The hearing panel further ignored exculpatory evidence in the form of text and Facebook messages the parties had exchanged at the time surrounding Jane's allegations.

251.     The hearing panel ignored the lack of corroboration of Jane's claims in the Facebook and text messages submitted to the panel.

252.     The hearing panel dismissed John's claims of retaliation by Jane, despite "adverse social actions" being specifically listed as a form of retaliation in MIT's Mind and Hand Book 2019. *See* Exh. 3, p. 29.

253.     Although both parties shared their viewpoints in detail to many people, Jane made clear that she was telling her story and smearing John's reputation because Jane had heard from Sarah Rankin that John told MIT's Title IX office that Jane had abused him.

254.     In texts that were exhibits to the investigative report, Jane stated to John's friend that "I just want you to know what kind of person you are supporting" and tried to convince him to stop supporting John.

255.     In another set of texts, Jane reached out to more friends and tried to convince them to isolate and reject John and to stop being his friend.

33

256. Based on evidence that both parties had participated in similar behavior in telling others their version of events, the hearing panel found John alone responsible for retaliation, while finding Jane not responsible for retaliation.

257. Jane was found responsible only for a violation of MIT's "community well-being" policy. *See* Exh. 3, p. 15.

258. Jane admitted in interviews that she had poured water on John during a fight while they were dating and prior to January 27, 2019.

259. Despite Jane's admission that she had poured water on John, Jane was found not responsible for both intimate partner violence and for violating the Institute's expectations for student behavior.

260. Jane also admitted that she and John "would both walk in and out of each other's rooms."

261. Despite Jane's admission, John alone was found responsible for a violation of MIT's policy surrounding unauthorized access.

262. Following its determinations of responsibility for policy violations, the panel reviewed written submissions from the parties on the question of appropriate sanctions.

263. MIT expelled John while issuing Jane only a disciplinary warning with no transcript notation.

264. John was found responsible for more violations of MIT policy than Jane for similar allegations due to anti-male gender bias.

265. John's outcome and sanction was more severe than Jane's due to anti-male gender bias.

34

## IX.  **John Submits an Appeal**

266.    John timely submitted an appeal to MIT, pointing out evidence of procedural irregularities and bias demonstrated by both the investigators and the hearing panel.

267.    In his appeal document, John challenged the procedural irregularities present in the investigation, including the differential assessment of evidence submitted by John and Jane; the fact that John was interrogated by investigators prior to having sufficient notice of the allegations against him; and the fact the investigators disregarded his submitted evidence due to alleged "untimeliness" despite accepting additional evidence from Jane.

268.    John specifically pointed out that MIT had violated its own policies in considering irrelevant sexual history including consensual past sexual relationship with his ex-girlfriend.

269.    John requested that MIT correct its errors, including a request to accept his additional evidence proffered during the investigation.

270.    John acknowledged and accepted responsibility for his behavior on January 27, 2019, acknowledging certain violations of MIT policies.

271.    John requested that MIT reverse its findings as to all allegations of sexual misconduct, which Jane added only after learning of John's claims against her, and John continued to maintain his innocence with regard to all such claims.

272.    John's appeal was denied.

273.    As a result of Defendant's actions and inactions, John has suffered psychological, emotional, and reputational damages, economic injury, and the loss of educational and career opportunities.

4885-3344-5675, v. 14

274.     John has been diagnosed with Major Depressive Disorder, Recurrent, Moderate-Severe and Generalized Anxiety Disorder.

275.     John, therefore, brings this action to obtain relief based on claims a violation of Title IX and/or other state law claims.

## CLAIM ONE
### Violation of Title IX
### (Selective Enforcement)

276.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

277.     Title IX, 20 U.S.C. §§ 1681 *et seq.*, prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.

278.     MIT is an education program or activity operated by receipt of Federal financial assistance.

279.     Title IX is enforceable through an implied right of action affording an individual discriminated against due to his gender pecuniary damages and equitable relief.

280.     Title IX may be violated by an institution of higher education's imposition of discipline where gender is a motivating factor in the decision to discipline.

281.     MIT violated Title IX when, *inter alia*, investigators (i) did not document all of the available evidence; (ii) did not objectively evaluate credibility; and (iii) did not synthesize all available evidence.

282.     As described herein, John's evidence was repeatedly excluded from consideration, and his witnesses were not interviewed.

36

283. The investigators and COD panel relied on evidence from Jane that was irrelevant by MIT's own standards and policies, to the detriment of John.

284. Investigators' comments that John "had no evidence" of his complaint prior to any investigation demonstrated their bias in approaching the entire investigation.

285. The final investigative report and hearing outcome employed a significant double-standard as to John and Jane's claims that can only be explained by the parties' genders.

286. MIT violated requirements set forth in the September 2017 guidance when it forced John to leave his dorm, permitting Jane to remain in place. *See* U.S. Dept. of Ed. Office for Civil Rights, Q&A on Campus Sexual Misconduct (Sept. 2017) ("a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available to only one party.")

287. MIT further violated the 2017 Guidance when it employed "investigative techniques and approaches that apply sex stereotypes and generalizations[,]" including the stated incredulity of investigators that John, as a man, could have been restrained and abused by Jane because she was a woman.

288. As outlined herein, investigators utilized a gendered double-standard in evaluating each party's credibility, drawing opposite conclusions from literally identical pieces of evidence.

289. Through the investigation and hearing, investigators and hearing panelists permitted consideration of John's past sex life through testimony by an ex-girlfriend (who agreed that all of her interactions with John were consensual), in violation of MIT policy. *See* Exh. 2, p. 12.

37

290.     MIT did not gather or rely upon any evidence of Jane's sexual history through any ex-partners or otherwise.

291.     Anti-male gender bias influenced John's case because he alone was found responsible for violating multiple provisions of MIT's Mind and Hand Book despite similar evidence of similar violations by Jane.

292.     MIT made blanket credibility determinations favoring Jane and disfavoring John with no articulable difference between the parties except each individual's gender.

293.     MIT emphasized and overstated evidence of Jane's version of events during both the investigation and COD hearing.

294.     MIT minimized and ignored evidence supporting John's version of events.

295.     MIT's differential treatment, investigation, and adjudication of John's and Jane's similarly situated Title IX complaints demonstrates anti-male gender bias.

296.     As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

## CLAIM TWO
### Violation of Title IX
### (Erroneous Outcome)

297.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

298.     MIT has been subject to external and internal pressures to disproportionately punish males accused of sexual assault.

38

299. MIT is, *inter alia*, the subject of two (2) open Department of Education Office of Civil Rights investigations for alleged discrimination against male students and prospective students.

300. MIT has been the subject of media controversy for accepting donations from convicted sex offender Jeffrey Epstein. *See* L. Rafael Reif, MIT News, Letter Regarding Jeffrey Epstein and MIT, https://news.mit.edu/2019/letter-regarding-jeffrey-epstein-and-mit-0822 (last visited September 2, 2022).

301. MIT has overcorrected in response to these and other pressures to disproportionately target male students accused of sexual assault.

302. MIT has made efforts to specifically target males accused of sexual assault and to find them responsible for alleged misconduct without substantial evidence.

303. MIT ignored evidence supporting John's version of events regarding his claims against Jane.

304. MIT credited Jane's version of events even though her claims against John evolved over time.

305. MIT failed to conduct an adequate, reliable, and impartial investigation of John and Jane's claims in violation of Title IX and MIT's own policies, and there is an articulable doubt as to the accuracy of the outcome of the investigation and subsequent hearing.

306. MIT failed to train its investigators on the components of an adequate, reliable, and impartial investigation of a Title IX complaint.

307.     MIT failed to assess John and Jane's credibility in a consistent manner, demonstrating anti-male gender bias in crediting Jane's credibility to the exclusion of John's based on similar evidence.

308.     MIT failed to consistently assess corroborating evidence submitted by John and Jane, evidencing anti-male gender bias in consistently crediting Jane's corroborating evidence while discrediting substantially identical evidence submitted by John.

309.     As a result of MIT's gender bias against males involved in Title IX proceedings, John was erroneously found responsible for sexual misconduct that he did not commit.

310.     As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

**CLAIM THREE**
**Breach of Contract**

311.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

312.     The relationship between a university and its students is contractual and includes the school's policies relating to disciplinary proceedings, including the Guide. *See* Exh. 2.

313.     The Guide (*see* Exh. 2) and the Mind and Hand Book (*see* Exh. 3) are each a part of the binding contract between John and MIT.

314.     MIT offered enrollment to John, and he accepted that offer and paid MIT tuition.

315.     An express and/or implied contract under Massachusetts law was created when John accepted an offer of admission to MIT and paid the tuition and fees.

40

316.     It is well-established that the relationship between a student and his educational institution is contractual in nature, with the terms of contract established by the student handbook and other related policies. *See Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 169 (D. Mass. 2017); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 593 (D. Mass. 2016).

317.     John satisfied all of the obligations required by MIT to remain in good standing, and he enrolled at MIT with the understanding and reasonable expectation that MIT would act fairly, impartially and abide by the terms of the Mind and Hand Book and the Guide.

318.     John satisfied all of the obligations required by MIT to remain in good standing, and he enrolled at MIT with the understanding and reasonable expectation that MIT would fulfill its contractual obligations to him and that he would graduate with a diploma upon completing all academic requirements.

319.     MIT materially breached its contractual obligations to John under the Guide (Exh. 2), *inter alia*, as follows:

  A.   Failing to fairly assess John's safety and to offer John support or resources as a complainant;

  B.   Failing to explain the importance of preserving forensic and other evidence of John's recent sexual assaults by Jane;

  C.   Failing to identify witnesses or engage in any investigation following John's initial report;

  D.   Failing to inform John of his options for resolution or to discuss his concerns in participating in the Title IX process; and

     E.   Failing to inform John of his right to be free from retaliation and failing to protect

John from Jane's retaliation, including a campaign of social retaliation.

320.    MIT failed to provide John with appropriate interim measures to protect John
from Jane.

321.    MIT breached its "commitment to provide a reasonably safe and non-
discriminatory environment" for John. *Id.* p. 6.

322.    MIT breached its commitment to provide a "full, thorough, prompt, fair, and
impartial" investigation of John's and Jane's allegations. *See id.* p. 8.

323.    MIT breached its commitment to provide "the parties […] an equal opportunity to
participate" in the investigation process by, *inter alia*, failing to assess John's and Jane's
credibility in the same manner and by considering belated and ghostwritten materials from Jane
while denying John the opportunity to submit supplementary materials to the investigators. *See
id.* p. 9.

324.    MIT breached its policies by permitting Jane to submit materials drafted by her
attorneys, while its policies provided that "all parties are required to affirm that materials they
submit are their own work." *Id.* p. 10.

325.    MIT breached its policy against consideration of prior sexual history when it
improperly considered irrelevant testimony of John's ex-girlfriend. *See* Exh. 2, p. 12.

326.    MIT breached its contract with John when it permitted gender bias to be the
motivating factor in its findings of responsibility and sanctions against John.

327.    MIT breached its contract with John when it permitted gender bias to be the
motivating factor in its findings of responsibility and sanctions against Jane.

42

328. MIT breached its contract with John by discriminating against John on the basis of sex in violation of the Mind and Hand Book 2017-2019, which each state that MIT "is committed to the principle of equal opportunity in education and employment" and that it "does not discriminate against individuals on the basis of race, color, [or] sex[.]" *See* Exh. 3, p. 28.

329. As a direct and foreseeable consequence of the above material breaches of contract by Defendants, John sustained damages, including, without limitation, loss of education and career opportunities, economic injuries, and other direct and consequential damages.

330. As a result, John is entitled to recover damages in an amount to be determined at trial, plus pre and post judgment interest and attorney fees and costs.

**CLAIM FOUR**
**Promissory Estoppel**

331. John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

332. The 2017-2019 Mind and Hand Books and the Guide contain unambiguous representations and promises that MIT should have reasonably expected to induce action or forbearance on the part of John.

333. MIT expected or should have expected John to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain John's educational objectives, to have his health, safety, welfare, and human rights protected, to have any claims brought against him under the Mind and Hand Books to be investigated and heard through an unbiased, objective, and impartial process, to be free from discrimination, and to have any complaints resolved impartially and promptly.

43

334.     John reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by MIT, choosing to attend MIT rather than other schools of equal caliber.

335.     These express and implied promises and representations made by MIT must be enforced to prevent substantial injustice to John.

336.     Based on the foregoing, MIT is liable to John based on promissory estoppel.

337.     As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

338.     As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

<u>**CLAIM FIVE**</u>
**Denial of Basic Fairness/Arbitrary and Capricious Decision-Making**

339.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

340.     John and MIT had a contractual relationship, consisting of, *inter alia*, John's promise to pay tuition and MIT's provision of educational services.

341.     Consistent with their contractual relationship, John and MIT each owed each other a duty of good faith and fair dealing.

342.     MIT was required to conduct its disciplinary proceedings involving John with basic fairness. Consistent with the implied covenant of good faith and fair dealing, the 2017-2019 MIT

44

Mind and Hand Books state MIT's commitment to "resolve complaints of alleged violations" in a way that is "objective and educational" and not adversarial. *See* Exh. 3, p. 63.

343.    MIT had a duty to ensure the proceedings against John and Jane were conducted in good faith and with basic fairness.

344.    MIT breached its duty of good faith and basic fairness when it failed to fairly and fully investigate John's claims, and failed to adjudicate the allegations against John in an objective and fair manner. By way of example and not limitation:

    (a) MIT made blanket credibility determinations favoring Jane and disfavoring John with no articulable difference except in each individual's gender.

    (b) MIT emphasized and overstated evidence of Jane's version of events during both the investigation and COD hearing.

    (c) MIT minimized and ignored evidence supporting John's version of events.

    (d) MIT's differential treatment, investigation, and adjudication of John's and Jane's respective claims demonstrate gender bias against John.

    (e)  MIT failed to fairly assess John's safety and to offer John support or resources as a complainant;

    (f) MIT failed to explain the importance of preserving forensic and other evidence of John's recent sexual assaults by Jane;

    (g) MIT failed to identify witnesses or engage in any investigation following John's initial report;

    (h) MIT failed to inform John of his options for resolution or to discuss his concerns in participating in the Title IX process;

(i) MIT failed to inform John of his right to be free from retaliation and failing to protect John from Jane's retaliation, including a campaign of social retaliation; and

(j) MIT failed to provide John with appropriate interim measures to protect John from Jane.

345.    Based on the aforementioned facts and circumstances, MIT breached its express and/or implied contract with John because MIT breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John.

346.    MIT failed its duty of good faith and fair dealing when it committed the procedural and substantive errors outlined above, meted out disproportionate findings and sanctions between John and Jane based on bias, and engaged in a flawed process finding John responsible for misconduct and Jane not responsible based on similar facts.

347.    John is entitled to recover damages for MIT's breach of express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

**WHEREFORE,** John respectfully requests that this Court:

(A)    Issue a declaration that MIT's Title IX process was unlawful as applied to John and Jane;

(B)    Enter permanent injunctive relief that vacates the decision of MIT to expel John and that removes from his academic record all references to the decision and any other related sanctions or disciplinary actions;

46

(C)   Award compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress suffered by John;

(D)   Award court costs and other reasonable expenses incurred in maintaining this action, including attorney fees; and

(E)   Award such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.

Dated: September 19, 2022                    Respectfully submitted,

/s/ Ruth O'Meara Costello
_____
Ruth O'Meara-Costello (BBO #667566)
ZALKIND DUNCAN & BERNSTEIN LLP
65 Atlantic Avenue
Boston, Massachusetts 02110
P: (617) 742-6020
F: (617) 742-3269
E: rcostello@zalkindlaw.com

Susan C. Stone
Kristina W. Supler
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com
*Motion to Admit Pro Hac Vice pending*

*Counsel for Plaintiff John Doe*